Arguments not to exceed 10 minutes for each defendant, 20 minutes for the plaintiff, Mr. Jagger for the appellant Davis. Good morning. May it please the court. My name is Steve Jagger. I'm the plaintiff's attorney.   And I represent John Davis. For Mr. Davis, the conduct by the government and the decisions by the district court essentially foreclosed the possibility of any type of entrapment defense from being successful in this case. As the court is aware, the Supreme Court has long recognized entrapment as a valid defense. The court has explained that entrapment occurs when the criminal conduct is the product of the creative activity of law enforcement officials. It further explained that it is the function of law enforcement to prevent crime and to apprehend criminals, not to make crime and make criminals. When the defense is raised, the accused may examine, per the Supreme Court, the conduct of the government agents, i.e. the inducement that they suffered, and their own conduct, predisposition, is also subject to examination. To establish entrapment as a matter of law, the controlling facts must be undisputed. Here, most of the facts present are undisputed before this court. The court has explained that... Was this defense preserved? Was this argument raised below? Entrapment was raised below. How was it raised with respect to your client? They argued before the judge that the entrapment defense should be instructed to the jury, offered proof of disposition... Using the word entrapment? I thought Wilson preserved it quite clearly. I wasn't sure your client did. The trial attorney below made a Rule 29 motion on all charges for sufficiency of the evidence, including inducement and predisposition elements. I think the record before the district court was pretty clear that inducement, as a matter of law, was present, and that the government failed to satisfy their burden on the predisposition element. The record from the beginning shows that my client, Mr. Davis, was doing everything he could, prior to being approached by the government, to be on the straight and narrow. He was working odd jobs, such as cutting grass, shoveling snow, doing painting jobs, working on cars, anything he could do to try to stay out of trouble. He referred to these jobs as plugs. The record shows that when he was at the initial meeting with the CI and the agent, they lured him there under the pretext that he was going to be getting a job with the CI doing cleaning business. Cleaning buildings, houses, I guess, things of that nature. So when he went there under that false representation that he was going to be getting a job, it quickly turned to the script of the ATF about this stash house robbery and everything that could go with that. And at one point, Mr. Davis, in fact, actually said, you know, I would rather keep the plug, meaning the job, than do this robbery. But it was because of the constant inducement that was, I guess... What role does it play when it comes to this argument that the government's proposed crime did not become the ultimate proposed crime? The proposed crime was, there was quite a bit of innovation by Davis and Wilson when it comes to what they were ultimately planning to do. That seems to undercut entrapment to me. I think, though, if you look, there's a lot... But people induced to do something usually do the thing that they were being induced to do. That's not what happened here. Well, I think there's an argument that could be made that it was, because there's certain references by the ATF agent and the CI both about taking alternative measures to both increase the profit that was received, as well as to kind of handle the risk associated with what they were planning. You're right. I mean, initially it was the Stash House robbery. But at one point in time, it was actually the CI who brought up doing various different things, such as... And I'm trying to turn to the references for the court. He didn't bring up the idea of killing the undercover officer, did he? Well, the CI actually approached that topic and said he would be the one to do it at various times. And the ATF agent himself... Was it his scheme? I thought it was Davis and Wilson that came up with the idea. Well, I don't think that's clear from the record. I think there's more references by the CI. That's a sufficiency question, right? Well, except for here, we couldn't have a sufficient record on that particular issue because the CI was never produced. Well, they're kind of intermingled because if you can't have the CI before the court to be cross-examined on these types of inducements, on what the actual plans were, who said what when... Well, see, Davis and Wilson were there, weren't they? I mean, it can collaborate what they know, but is there any information they don't know that they wanted from the testimony of the CI? Well, I don't think they could challenge various things. First of all, there were unintelligible portions of the transcript where nobody knows what was said. I mean, weren't they present? I mean, they know what was said because they were there. Right, but before the district court, which goes to the sufficiency argument, they weren't able to merit or ferret out what the CI actually said, what was done, 100% of the time because they met outside of the presence of the recording devices. That's clear from the record. And they didn't have the opportunity to challenge anything that happened outside of what Agent Nether controlled for the judge and jury to hear. Everything that happened in this case from the CI's perspective was filtered through Agent Nether's and not permitted to be cross-examined. And I do think they go together because had they had the chance to do that, they could have explored some of these different inducements, who said what first, who said what when. I mean, none of this would have happened without the Agent Nethers initially approaching the CI, I guess, to recruit Davis and ultimately Mr. Wilson. My point is they know what happened because they were present. So it's not like they need something to discover. Was there something to discover that they had to question the CI about that they didn't know about? Well, I guess where I'm getting confused is I think you're looking at it from Davis and Wilson, whereas I'm looking at it from what the jury could know. And the jury couldn't hear everything about the CI because he wasn't there. Everything that was said about what the CI did or said or what Mr. Davis did or Mr. Wilson did, as far as the CI, came through the agent. So the jury didn't have that access. So the question is if you had an opportunity to help call the CI, non, how, just following up on my colleague's question, how would that have helped your defense? What would you have looked to non to do if you were able to call him as a witness? I think they would have been able to fully explore the type of inducements that occurred, the fact that Mr. Davis was not predisposed to commit this crime. All the evidence about predisposition came from Mr. Nunn's statement to the agent that he has done this in the past, so let's go get him to do this now. But there's nothing in the record to support that. So you think non would have testified contrary to the other evidence that came out in the case? Unfortunately, we won't know that, but I think that if nothing else, he should have had the opportunity to confront non about those things per the confrontation clause. And I see that I'm out of time, but I'm happy to answer any other questions. Just on confrontation, very quickly, you also argued the statements from the CI that came in that were substantive in nature. The government argues that those statements were offered for a different purpose. So if you could just set out very quickly, what are the specific, two or three of the specific statements that came in that were hearsay that you thought were substantive, that were offered for the truth of the matter? Well, in light of the entrapment defense being asserted, one of those statements was, like I just said, that the agent testified about statements that the CI made that Mr. Davis was previously involved in stash house drug robberies. Obviously, that goes directly to the predisposition element of the defense. Another one was that the agent testified that he himself never saw Mr. Davis with a gun, nor had any kind of evidence about heroin, but he learned that all of that had come in through the statements of Mr. Nunn. So again, that goes directly to the truth of the matter asserted as far as the crimes charged in this case. And then finally, Agent Nethers is testifying to voice identification and explaining sounds and recordings and things that people might be plotting and doing on these tapes, but he wasn't there when they were made. The CI was. So again, all of the plot that goes to the other offense, meaning, I guess, the plot to murder. I think, I mean, maybe for rebuttal, think about this. I mean, I just don't understand prejudice on any of this. As long as you've got these recordings that show the initial idea was the stash house and then it shifted through Wilson and Davis to a different crime altogether, that seems very tough to get around when it comes to showing prejudice. So think about that for rebuttal because that's what's hardest for me on this case. Can I say one thing? Yeah. I'll ask of government, but in terms of the Armed Career Criminal Act, just think about that too. Great. Thank you. Okay. Yeah. Ms. Darker. Good morning, Your Honors. I'm Katine Darker. I represent Mr. Wilson on appeal. I am going to argue that because we have very little time and I'm going to focus on certain things, because our brief was voluminous and then we have a reply brief that we filed that I think is highly relevant to some of the issues that the Court's been asking questions about. But our position is that Mr. Wilson's conviction should be reversed for the reasons, obviously, we submitted in the brief, but I'm going to focus for these purposes right now on the Confrontation Clause violation and hopefully address some of it. Can you respond to the question I just asked? I can. I'm just struggling with how you get around that. I understand. You're supposedly induced to do Crime A, and after that inducement, the defendants are saying, no, no, no, let's do it this way. I just find myself going, well, that just seems to destroy entrapment and show the Confrontation Clause stuff. I don't see the prejudice from that either. Well, I understand the Court's position on that, and that's actually a question I asked myself initially, so I looked into it, and I think that the change of plan here from the Stash House robbery to something else, which was either robbing Agent Nether and taking his stuff, or it was robbing Agent Nether and killing him.  It does not undercut entrapment, and the reason is that when the government approached or when the CI approached these individuals, they were, as the co-defendants council said, they were looking for jobs. They wanted to try, at least to a certain extent, to rehabilitate. They were not the caliber of criminals that commit Stash House robberies, and it became very clear very quickly, or it should have become very clear very quickly. They were concerned. They did not want to do this. I think this much is clear is, as far as Wilson is concerned, he did not want to go into that Stash House. So what does the CI do? The CI has a very strong incentive. He's trying to get a lesser sentence for his brother, who is an armed career criminal, and in order to do that, he's cooperating with the ATF to get this break for his brother. And so what he does when he realizes, I'm going to lose this because they can't do a Stash House robbery. They don't have the wherewithal. These are not the kind of people that can do this. They have no idea what they're doing, and they've told me they're scared. They don't want to do it. So, yes, let's fabricate and let's come to a plan B, and let's find something else that we can have them do that will get me the break that I need for my brother, who, again, is an armed career criminal, has gotten a reduction in sentence from 15 years to 10 years for nothing that has to do with any justice-related issues like remorse, his degree of involvement in whatever offense he committed, his degree of cooperation. He's not the one who cooperated. His brother is. So I think that that's what happened in this case, and that is actually at this point from looking at the record for hours on end my theory of the case. Isn't that a good argument for the jury? That would have been a great argument for the jury, absolutely. It didn't work, did it? Well, it wasn't presented to the jury, but the issue is on appeal, though, whether this change of plan undercuts the entrapment defense, and my position is, Mr. Wilson's position is, that it absolutely does not. They were still entrapped. The government pushed. Do you have a case where it has this situation where the inducement is to do the greater crime and the defendants ultimately do a lesser crime because they don't think they're up to the greater crime, and the court still says, the appellate court still says, well, yeah, that's entrapment? We don't, Your Honor, because, and that's the problem even with the confrontation clause analysis, is that there is no case law, and the government has presented no case law because, and I think the court at one point said there is no case law. This is an entrapment case, and I cannot find a case, and the government has not cited a case where there's a confrontation clause and the case, a confrontation clause issue and the case involves entrapment. The cases cited by the government involve tips that were provided by informants, and granted in this case initially we have a tip, I'll certainly acknowledge that, but it's much more than that because the tips in those cases lead to an investigation. Those investigations produce a substantial amount of evidence. Here, the out-of-court statements are the evidence, and that is what's problematic, and there are no entrapment cases where this CI or this person who coordinated this whole thing was not before the jury, and that transition from crime A to crime B or crime C is a transition granted if we acknowledge or if we consider that it involved killing somebody to a greater crime, which incidentally granted Mr. Wilson a lesser sentence than the drug crime. But what do we do with the taped conversations of Wilson and Davis? They sure seem pretty comfortable talking about doing some pretty brutal things. They do. They don't sound like the kind of people that were just innocents that suddenly were induced to. . . It seems like a pretty amazing job of a government official to get them to start talking and thinking that way. I mean, it seems quite implausible to me. Well, first, it's not a government official that gets them to start talking that way. It's actually somebody who is closely related to them. This is the only entrapment case I could find where the CI and the targets tell each other, I love you. That's very different from other entrapment cases. This is the only entrapment case I could find where the targets are initially duped. Which way does it cut that they know each other? Why does that prove that it transformed them? I just find that incredible, really. Your Honor, I'm not saying that it transformed them. These are people who have had trouble with the law for a long time and that have had issues and that have issues with drugs, drinking, and so on. There's no doubt about it. These are not the caliber of people that the ATF should be targeting for these types of operations. And the problem we have here with respect to the Confrontation Clause is that the main cases quoted by the government, which are Dietz and Jones, they both cite and rely on at length a case called United States v. Cromer where the court, this court, overturned the conviction for similar statements that were out-of-court statements. And it stands for the proposition, I quote, that when out-of-court statements by a CI implicates the defendants in a way that goes to the heart of the prosecution's case, admitting those statements violates the Confrontation Clause absent cross-examination. It's not the rule, the Confrontation Rule, isn't it? It has to be testimonial to violate the Constitution. Absolutely, Your Honor. The statement you wrote, just read, is not accurate, right? Well, it's the law. No, the law is that there is not a violation of the Confrontation Clause unless the dispute statement is testimonial, not that it goes to the heart of the case. That's correct, Your Honor. That's the initial inquiry. And then the second step to determine if they're testimonial and then to determine if... How are the statements here testimonial that you dispute from the CI? The statements of the CI are testimonial because they were designed and made for the very purpose of prosecution. And I don't believe, unless I'm misreading the government's position, what they're saying, I don't believe that they're arguing that the statements were not testimonial. My understanding of Sixth Circuit law at this point is that statements to law enforcement by CIs are almost necessarily testimonial. The question is whether they were offered for the truth of the matter asserted. I believe that's the main legal issue here. And what the government says, and I'm sorry, I'm almost out of time, but what the government says is that they were offered for the purpose of context. But that's not true. Here they're elemental. They go not to an element of the defense, I'm sorry, of the offense, but to an element of the defense. So, well, surely some of them do count as background. Give us the two or three that you think are the ones that you say, boy, how can you say that's not testimonial? Absolutely, Your Honor. And I'm out of time. May I continue? Will you answer that question? Yes. I will. Yes. Okay. So there are two categories. I just want your two or three best sentences. Just tell me the two or three. We have the record. I want to know what you think the two or three most prejudicial things are. Yes. In the recordings, regarding killing Nether, the CI says, we're going to knock him off. Again, in the recording, Nether tells the CI, tell me if something changes. He responds, ain't nothing going to change, that's what it is. He again says, Exhibit 13.3, speaking of Wilson, ain't no way Deon not going to kill somebody, y'all trigger happy. I'm leaving the cussing out. He says to Nether, they're more than down, ain't about being down, they're more than down, really. Says again to Nether in response. So I'll look, but I would say for rebuttal, think about this. I think everything you've just said you can find straight from the mouth of Davis or Wilson. So think about that for rebuttal, and I'll let you address that point in rebuttal. But that's my sense of the case. So I may be wrong, but that's what I'm looking for you to correct if that misimpression is wrong. Yes, Your Honor. And also, among the statements, I only quoted the ones in the recording. I have a few from Nether himself. Do you want to hear them, or should I leave it? I want you to answer the question I just asked on rebuttal, which is I want something that does not also effectively come from the mouth of Davis or Wilson. If it does, it's not prejudicial. No, I didn't want to ask a question. I just wanted to clear up. The question I asked Mr. Jager to think about I actually should have been asking you to think about, the Armed Career Criminals Act. I apologize for that. Go ahead. I say it now so the government can respond. Go ahead. Yes. Your Honor, we submitted a 28-J letter with respect to that issue, and there is actually a district court in Michigan who has just found that the third offense, I think, or subsequent offense, domestic violence, does not qualify as a predicate under the Armed Career Criminal Act. The problem we have here is that Mr. Wilson was convicted of a violation of 922G before, had been released recently, and in that PSR he was never found to be an armed career criminal. In fact, the PSR only shows one domestic violence conviction. And I'm not familiar with how the state of Michigan works, but they have this register of deeds, which as I understand it is not an official judgment of conviction, although it may have been considered that way by Michigan courts. I don't know. You're saying even on plain error review that there should be reversal on that? Absolutely. Do you agree it's plain error? I agree, Your Honor, that it's plain error. Absolutely. And I won't comment further on that issue. We'll submit it on what we have submitted in the brief and the 28J letter, but I think that there's definitely plain error there, yes, especially in light of the recent retroactivity ruling on Johnson. Okay, great. You'll get your full rebuttal, so thank you. Thank you. Government, Mr. Martin. Good morning, Your Honors. May it please the Court, Michael Martin on behalf of the United States. I'd like to start off where Judge Sutton started off, and that was whether Davis preserved the entrapment defense issue, and he did not. Is this really worth fighting about, given that Wilson did preserve it and there's so much overlap between the two? You have to address it one way or the other, I agree. That's kind of what I'm wondering. Yes, I would agree with that. But I did want to just clarify that, in my view, he had waived it. And let me also address another question that you asked early, which was if the defendants had essentially come up with their own plan, doesn't that become problematic for their entrapment defense? And the answer is absolutely yes. And what I wanted to point out was the defendants came up with their own plan, or at least Defendant Davis did, almost immediately after his first meeting with the undercover agent. As he left the hotel room after meeting with the undercover agent, as he left with the CI, as you know, the CI had a recording device on him, and as they're walking out to the car and then get into the car, it's Defendant Davis who says, let's not go into the stash house, let's knock him off, or words to that effect. So very early on, almost immediately, it's Defendant Davis who has in his mind, I'm changing the plan, and the plan is going to be to murder the undercover agent. And while it is true that later on, once that plan crystallized, the informant did volunteer to actually do the killing, he did so, according to the agent, because he was trying to protect the agent, the plan was still from the defendants that the agent would be killed. So the plan to kill the agent never originated with the informant, and certainly not from the undercover agent himself. Counsel for Mr. Wilson said there are no cases on this where the plan changes. I'm surprised to hear that. Aren't there some cases? We did cite one case in our brief, and I don't recall the facts of that case. I largely agree with you, there are not a lot of cases in this point. There aren't, and they're not in the drug house stash robbery type scenario. Usually they don't change the plan on their own initiative to come up with an even more brutal plan, a more dangerous plan potentially, than what was initially proposed. That's true. I thought this plan fell in the category, they're both pretty bad, but I thought this was less outrageous, believe it or not. There's going to be less shooting, right? When you're going into a stash house, the original way they were talking about it did sound worse. I suppose the first plan would involve more shooting, that's true, but the plan they came up with involved a killing that was particularly personal and close, potentially slitting somebody's throat with a knife. You're a lot closer to an individual, so it could be, in that respect, potentially more dangerous. I guess it's sort of two sides of the same coin, but in any event, there's no dispute that the plan that was ultimately hatched by the defendants was a particularly brutal and heinous type plan, which I think not only undercuts the entrapment defense because they came up with the plan, but the nature of the plan they came up undercuts the entrapment defense because if an individual hadn't, say, if he was an unwary innocent, if he believed the stash house was dangerous, an unwary innocent person would say, I'm not meeting with the undercover anymore, I'm not doing this, I'm not going to participate, I'm out. An unwary criminal, if he believes the stash house to be dangerous, would come up with the exact type of plan that defendants did, and that is change the plan, particularly brutal, and that undercuts the notion that they were somehow entrapped as well. So what about the Confrontation Clause? I mean, it does seem like they have a fair point that some of the statements go beyond background. You seem pretty close to, for the truth of the matter, asserted. So how do we deal with that? Well, my first response is I think you need to look very closely at the statements themselves. Mr. Davis, in his brief, never really cited what specific statements from the CI were problematic. Mr. Wilson cited a few in his brief, and I responded to those, and in my brief I laid out exactly what the conversation was. And while I would agree that, at least on their face, those conversations did go to sort of the nature of the crime, the CI saying, you know, you are trigger happy, for example, in a normal case I would agree that those would be prejudicial and perhaps should be excluded, but in this instance they weren't really offered for background, because when you look at the progression of that conversation, when he says you guys are trigger happy, the next statement is from Mr. Davis saying, yeah, we need to dust them off. Well, for the jury to understand what dust off in that context means, they need to understand the flow of the conversation. They need to understand that the CI is talking to him. What else were they going to be, what else did they mean by dust off? Well, the defendants claimed, I know this seems incredible, but yes, the defendants argued at trial that they were interested in a cleaning job, that that's the whole reason they showed up at the stash house. You were anxious about that defense? No, but you still, we have the burden of disproving the entrapment defense beyond a reasonable doubt. And so in order to tell the jury what that dust off means, I think it's entirely appropriate for the government to give the full context of the conversation. And let me also say that the defense, the first day of trial, was the government playing the audio recordings related to the drug stash house. We started with the recordings from the first undercover meeting at the hotel. And that first day, the defense objected on hearsay grounds to four of those recordings. And on the fourth objection, the district court sustained the objection, and the government asked for permission to redact out the informant's statements and admit just the defendant's statements for that particular exhibit. That evening, the government filed a motion for reconsideration, and the next morning before the trial began, defense counsel withdrew their objection to the exhibits and said on the record that the defense would rather have all of the CI statements come in than rather have them redacted and just have his own client's statements. And he said he wanted that because of his own trial strategy. And after that morning, after the morning of the second day, the defense lodged no objections to any of the recordings based on hearsay grounds. Wouldn't that be a better argument than that they're not substantive statements? A better argument for why, I mean, he's waived it, right, is what you're saying? He has waived, yes. But it goes to my point that he wanted those statements. The defense ultimately decided they wanted the CI's statements in. They wanted to be able to use them. So that was their trial strategy, and I have to say it wasn't a bad strategy because they wanted certain things that the CI said in order to pursue their entrapment defense. If I could turn to Judge Oliver's questions about the Armed Career Criminal Act. The issue related to the Armed Career Criminal Act has to do with what are the elements in Michigan for unarmed robbery and then domestic violence. And the unarmed robbery statute can be essentially committed in three ways. One is force and violence. The other is by assault, and the other is by putting the person in fear. And domestic violence similarly has as an element either an assault takes place or an assault and battery. So the two statutes are similar in that they both have this issue of assault, and the question then becomes what are the elements of the statutes and what is the definition of assault in Michigan. And to solve that problem... What did the judge do? How did the judge come to a conclusion on these? Well, the judge didn't come to a conclusion because it wasn't raised. The defendants didn't object in any way to the finding that they were an armed career criminal. So I think Judge Sutton asked, do you agree that it's a plain error? I think everybody does. So we don't have any record of what the district court found because it wasn't raised. There's no question about plain error review apparently, but it doesn't leave the judge of the obligation to point out the basis for his ruling or her ruling, does it? Well, there was a pre... Go ahead. You were going to say what the PSR says? Yeah, the pre-sentence report laid out what the convictions were. The government argued that he was an armed career criminal. The convictions were not objected to, and the finding that he was an armed career criminal was not objected to. So I don't think the district judge had any reason to elaborate in any detail on why these particular convictions were. I think everybody, it was uncontested, it was essentially almost agreed to that he was an armed career criminal. Well, you think the... So the judge didn't spell out whether he was looking at the residual clause... No, he did not. Or not. That's correct. And if he had been, then Johnson would be a problem, right? Yes, had he been, yes, Johnson would be a problem. What does the PSR say on this point? That he is an armed career criminal. No, I know, but does... Usually the PSRs explain their route. Was their route through the residual clause? I don't recall, Your Honor. I don't recall. That's really important. Well, even if... Wouldn't you agree that if the PSR had said this is a crime of violence through the residual clause and no one objected and everyone took that as a given, said armed career criminal, then you have Johnson, which of course is retroactive, wouldn't that be a problem? Not necessarily. Because the PSR can say one thing, but that doesn't necessarily mean that that's what the district... Well, I guess it's not a problem if you have a compelling case that you can satisfy it through another route, and I guess that's really the issue, I guess. That is the issue. That is the issue. What's your best alternative route again? It's a violent felony because it has as an element the use or attempted use of force and violence. Is that necessary for this Michigan offense? Is that the only way to commit the offense is what I'm getting at? Yes. Yes. And we know that because you need to go back in time to the time of the conviction and ask yourself what were the elements of the crime in 1996 when he committed the unarmed robbery and in 1998 when he committed the domestic violence conviction? I have to admit that or say that when I first began to research this problem, I thought going in that the definition of assault in Michigan, the common law definition, would be fairly static and unchanging and well-developed. And what I found was that in about the mid-2000s, it started to change to include not just a violent act but an offensive touching or an offensive perception of an offensive touching for assault. But that change took place in about the mid-2000s and we cite those cases in our brief. Prior to that, the Michigan Supreme Court was uniform in describing an assault as one involving injury. And that didn't change at all. And in fact, it didn't change at all until the mid-2000s. In our 28-J letter, we cited a Seventh Circuit decision from 1997. Remember, Defendant Wilson's unarmed robbery conviction is the year before, 1996. And so when the Seventh Circuit looked at unarmed robbery in Michigan in 1997, they canvassed the law on that decision. It's the United States v. Tyrell. And they concluded that unarmed robbery in Michigan had as an element, no matter how it was committed, the use of force and violence. In addition, the Michigan Supreme Court in 1995 in People v. Dadema, and that's also cited in our brief, said that the law in Michigan for assault requires the jury to find a specific intent to injure in all assault and battery cases. That's the year before Defendant Wilson's conviction. So given that precedent, I do not think in 1996 that unarmed robbery had anything other than an element of violence and force. And so therefore, I don't think there was any error on the part of the district court. And even if there was, I don't think it was plain or obvious given that the precedent changed almost a decade later in the mid-2000s. So for that reason, I don't think the defendants have met the plain error standard, and I think the court can affirm the Armed Career Criminal Act sentence on the record that exists now. Are there any other questions for me? Just one. Looking at the background of the defendants in this case and thinking about the entrapment issue, it says one of the things you look at is the character or reputation of the defendant, including any prior criminal record. Do you think their prior criminal records weigh heavily in favor of entrapment or just part of the equation and not too significant in your view? I think they do weigh in favor of entrapment. I think that their convictions were one piece of the character evidence. I think you could easily take away the convictions and find that they certainly had character to commit this type of crime, in part because of their own statements about killing people and dealing drugs that had nothing to do with this case. But certainly their convictions were remarkably similar to what happened here. Mr. Davis was convicted of home invasion and larceny, and he actually introduced in his case a state pre-sentence report that described that conviction, and it involved him and two other men going into a house. One of them was armed with a shotgun, beating and robbing a man and then fleeing, and it was Mr. Davis who, when he was apprehended, when he fled on foot, who had the shotgun nearby. Mr. Davis had also been convicted of assault with intent to do great bodily harm. He admitted on cross-examination when he testified that that involved him shooting a man in the rear end as the man fled after they were involved in an argument. So these convictions were very similar. They weren't exact, I acknowledge that, but they were similar in that they both had home invasion-type, robbery-type convictions, they both had convictions for violent conduct, and they both had convictions for firearm offenses. Okay. Thank you very much. Thank you. Mr. Yeager? To first address Judge Sutton's question to me, the question should not be whether or not the statements that were made also came out of the mouths of Davis and Wilson, but where those ideas originated. The record's clear that Agent Nether changed the plan from a stash house robbery to also having to potentially kill the people inside the stash house robbery. He said that it had to look like he was robbed in the process of the robbery, and then he said that if the guys in the stash house were killed, then he could act like he wasn't part of it, and the proceeds could be split. He told Mr. Davis that they could perform the robbery as planned if Davis would kill the people inside. But that's not the plan they agreed upon. Well, honestly, I'm a little confused as to which plan the government's even pointing to, because they're saying that the prior offenses support the robbery, but it seems like we're more focused on the conspiracy to commit murder, which there's nothing in their prior offenses to support that. So I'm a little bit confused, but the plan that ultimately was agreed upon, I guess that we're referencing, is the plot to kill Agent Nether. And to rob him, too, right? Well, that did come from Agent Nether. Agent Nether was the one that said it needs to look like I've been robbed, you need to rob me, I need to be, I guess, appearing like an innocent in this case. And then the CI is the one who came up with the plot to kill Agent Nether, because he said, I'm going to get him because I'll feel better if I pop him in his shit. I'll feel way better. He also stated that he would be, that Agent Nether was going to be getting knocked off, and he clarified, quote, I'll knock him off. That'd be my job. I thought that all came after Wilson and Davis had come up with the scheme. I thought that was kind of after the . . . I think the timing is a little unclear because we don't know exactly what was said outside of the presence of the tape recording devices between the two individuals. No, your clients do. But again, I go to what the jury knew, and I don't think that that could have been explored sufficiently at trial. Any other questions? No, thank you. Thank you. Thank you. I, again, have very little time, one minute, so I'm going to hurry up. With respect specifically to answer the court's question regarding the statements and the similar statements that were made by Davis and by Mr. Wilson, they are eerily similar to some of the statements that are made by the CI when we listen to them. We're submitting on the briefs what we said about the transcripts, and I think that poses a huge problem in this case. But at one point, Davis appears to just repeat what . . . Did the court give both sides an opportunity to review the transcripts? That's not clear from the record, Your Honor. As I understand it from what was filed on the district court record in December of this year, of last year, there were a number of things that were sent actually fairly late. But we cited case law in our responsive brief, in our reply brief, to the effect that there is . . . You had the transcripts before trial. I guess that's the question. I'm sorry? You had the transcripts before trial? I think they had them shortly before trial, Your Honor. So I guess I'm just saying that did give both sets of lawyers an opportunity to say these are inaccurate or this overstates or understates what happened in the call, right? That's correct, Your Honor. May I respond? Yes. I think the case law is clear that the defense does not have an obligation to raise an objection at the time or to provide counter transcripts, as the government argues they should have done, especially if they have some trouble with what is in there. And so I think that that was certainly discussed at trial. Why would you have no obligation to make an objection at trial? Oh, I think they had an obligation at trial, of course, as zealous advocates. They had that obligation. But I don't think they had an obligation pretrial to object. They can make a contemporaneous objection. Okay. Did they? I believe so, yes. Transcripts were inaccurate? Yes. There was actually at one point so much confusion about the transcripts, the way they were being introduced, and we discussed this in our brief, because they were being introduced almost as substantive evidence, and even the court was confused as to what was what. And the clear evidence of that, actually, is one of the jurors going back to the jury room with a transcript. I thought the objection was that they shouldn't see. I mean, my understanding is that they saw the videotape, and they had the transcripts to foul along. So a lot of this language is kind of hard to foul because it's slang and everything else. I thought the objection was that they had the transcript, not that it was inaccurate as to what was said. Am I incorrect on that? Respectfully, Your Honor, I think so, because I do remember very clearly at one point one of the trial counsels for the defense saying, let's just get rid of the transcripts because this is not making any sense. Everybody's struggling trying to figure out what's going on, and just let them listen to the audio. The problem with that, I'm sorry. That's not an argument that they're inaccurately transcribed, that's all. Well, I think within that argument was that it didn't match. It didn't make sense. Okay, I didn't see that. And from what I can recall, and I think we did make the argument in our reply brief as well as in our substantive brief or corrected brief, that there were substantial portions that didn't make sense where there was not a correct match. And the defense was allowed to submit their own transcripts if they chose to, right? I don't think time allowed, Your Honor, for them to do that. The judge allowed them to do it, whether you had time or not, right? I believe. I don't think that was raised as an issue, but I think they would have been permitted. I just don't think time allowed for them to do that. Thank you very much. May I make one last point, or am I done? Thank you so much. One very important thing that I want to point out, and I'll be very, very brief, is that the government says that they're only using this evidence for the purposes of background and context, and I understand that. But in its brief at page 36, 37, the government says, and it concedes basically, that the CI's statements go directly to what the government has to prove, meaning they're elemental. The government says they're used to show. It doesn't mean the CI statements go to the truth of what he was saying. It goes to the fact that they were set, and that's part of this overall criminal plan and scheme. The CI, we would like to think, didn't really intend to commit crime or to kill the undercover agent, so it doesn't go to the truthfulness of his statements, but rather that they were said, and because they were said in this context, they're relevant and admissible and not hearsay. May I respond? Sure. I mean, we believe they do go to the truthfulness. Do you think the CI really truthfully intended those statements to the truth? He did not truthfully intend what he said in the statements, that's all. No, he didn't say that was the plan, essentially. But more importantly, when we look at Nether's use of those hearsay statements in his testimony, he says, this is the information that was given to me was that Davis did this, armed robberies, did that and the other. A few months before, Davis was duped into buying fake cocaine. I guess we can agree to disagree, but I'm just saying that the confidential informant's statements don't go to the truthfulness of what he said, but rather that he said that and how the defendants reacted to those statements, whether or not they were true or not. I think they can be construed both ways. I agree, Your Honor, but because this is an entrapment case, I believe that makes it different because we're talking about elements. Thank you. Thanks to all three of you for your helpful briefs and oral arguments. We appreciate it. Mr. Yeager and Ms. Darker, I see you're court-appointed counsel. We really appreciate the service. We know you're not compensated as well as you should be for it, so we're quite grateful for your service to your clients in the courts.  We appreciate it. The case will be submitted.